JOHN H. HOLLY, *Appellee*, v. THE CITY OF NEODESHA, *Appellant*.

No. 17,807.

SYLLABUS BY THE COURT.

1. WATER RENTALS—*Advance Payments—Defaulted Payments.* Under the ordinance of the city, which owned its waterworks, water rentals were payable in advance on the first days of January and July of each year, and if not paid within ten days after due the water was to be turned off. In May a consumer paid in full for water for his greenhouse for the entire year in which the payment was made and his appropriation of the proper sum for that purpose was accepted and retained by the city with official knowledge of the facts. *Held,* the city was obliged to furnish the consumer with water for the entire year and was not privileged to turn off the water after July 10 for previous defaults.

Holly v. City of Neodesha.

2. WATER RENTALS—*Defaulted Payments—Right to Discontinue.* The right of a city or water company to discontinue water service if payment therefor be not regularly made fails unless promptly exercised in an effort to protect against imposition or loss in essentially current affairs.

3. WATER SERVICE—*Special Contract—Subsequent City Ordinance—Meters.* The consumer claimed a special contract for water service to his greenhouse at a flat rate. Afterwards he devoted a half acre of ground to the raising of celery, which he supplied with water from the greenhouse service. The city then passed an ordinance providing that gardens and gardeners should be supplied at specified meter rates, the water taker to install the meter. The consumer did not install a garden meter, and continued to use water for his garden as before. *Held,* the city had the right to discontinue service to him.

4. CITY WATER—*Consumer in Arrears—Discontinuance—Damages.* The city cut off the consumer's supply of water because, as it claimed, he was in arrears and would not install a meter. He was dependent upon the city for water and was at once confronted with the certainty of very great loss, which he in fact suffered. *Held,* it was the consumer's duty, under the circumstances, to submit to the city's exactions and procure a restoration of service in order to prevent loss.

5. —— *Involuntary Payment of Illegal Exactions—No Estoppel.* The power of the city to withhold water placed the parties on unequal terms and the law would have regarded as involuntary any payment made to secure a restoration of service.

6. WATER—*Discontinuance—Measure of Damages.* Assuming that the water was wrongfully turned off, the measure of the consumer's damages was the amount he would have been obliged to pay to secure a restoration of service and the amount of damages, if any, provable to the time water could have been supplied.

Appeal from Wilson district court. Opinion filed November 9, 1912. Reversed.

*A. H. Ward,* and *C. W. Shinn,* both of Neodesha, for the appellant.

*T. J. Hudson,* and *D. J. Sheedy,* both of Fredonia, for the appellee.

The opinion of the court was delivered by

BURCH, J.: The plaintiff' sued the defendant for damages resulting from the cutting off of the city water from his greenhouse, and recovered. The city appeals.

The city owns its waterworks. In October, 1902, on motion made in the city council, it was ordered that the plaintiff be furnished water at the rate of $15 per year for the remainder of the year 1902, and for the year 1903. This rate was fixed with reference to the plaintiff's business as the proprietor of a greenhouse. On December 30, 1903, an ordinance took effect fixing water rates which provided that rates for greenhouses, gardens and gardening should be governed by special contract. On May 23, 1907, an ordinance took effect providing that greenhouses, gardens and gardeners should be supplied at specified meter rates, the consumer to install a meter at his own expense. Under the ordinances of 1903 and 1907 the rate for a single faucet in a house was $6 per annum. Throughout the entire period involved in the controversy rentals for water furnished at flat rates were payable in advance on the first days of January and July in each year, and if not paid within ten days service was to be discontinued. On June 6, 1907, the water inspector asked the council for instructions relating to the plaintiff's water rates under the new ordinance. An investigation was made, it was found that the city records disclosed payments by the plaintiff for water since 1902 to be but $21.75, and the council ordered the city clerk to collect from him at the rate of $15 per year from 1902 until July 1, 1907, and then apply the meter rates. The plaintiff made no further payments, did not install a meter, and on July 23 the water was turned off.

The plaintiff based his action on a special contract for water at the rate of $6 per year. On October 8,

1903, the plaintiff granted the city the right to construct, maintain and operate a gas main through his premises. The grant was in writing, was signed by the plaintiff and his wife, and recited that it was made "for a valuable consideration to us in hand paid, the receipt of which is hereby acknowledged and confessed." The gas main was laid and was placed far enough below the surface that it did not interfere with the plaintiff's use of the ground. The plaintiff testified that the consideration was an agreement on the part of the city's water inspector, who negotiated the contract, that his water rate should be six dollars a year as long as the gas pipe was maintained on his premises. The city denied authority on the part of the inspector to make such a contract. No attempt was made to prove authority, the plaintiff relying wholly on ratification. The city contends that the evidence was insufficient to show that it became obligated in that manner. It further contends that the plaintiff was in arrears, conceding that a rate of six dollars per year took effect on October 8, 1903, and consequently that it had the right to discontinue service to the plaintiff.

The evidence from which ratification might be inferred was indeed quite meager, and giving the plaintiff credit for all his payments he was probably indebted to the city for water even at the six-dollar rate, but in view of the disposition to be made of the case it is not necessary to discuss the sufficiency of the evidence as against the demurrer to it interposed by the city.

By resolution of the council the city's water inspector was directed to assist the city clerk as collector. The plaintiff testified that on the 17th day of May, 1907, he met the inspector on the street by the Methodist church, and told the inspector he wanted to pay his water rent for the year. The inspector said, all right, but that he did not have his receipt book with

him. The plaintiff replied that the inspector could mail him a receipt, or that he would call for it, and that thereupon he paid the inspector $6, but never was given a receipt. The inspector testified that on going to his office he wrote a receipt for the money, specifying that it was for "hydrant" and that he then erased the word hydrant and wrote in its place the word "faucet." The inspector further testified that he understood he was collecting for a faucet in the plaintiff's house, that the plaintiff had a special contract for the greenhouse, and that this understanding arose in this way: In July, 1906, he collected $9 from the plaintiff in payment for water for the last half of the year 1905 and the year 1906. He then said to the plaintiff that the sum collected paid for the faucet in the plaintiff's house and asked, "What about the greenhouse?" The plaintiff replied that he had a contract for free water in his greenhouse which he could not produce just then because he was in a hurry. The inspector said he would carry it as an open account on the greenhouse until the plaintiff found his contract and brought it in. The matter ran along until the transaction occurred at the Methodist church in May, 1907, when the inspector again asked the plaintiff for his greenhouse contract. The plaintiff said he had been unable to find a copy of it, that it should be in the city clerk's office, and that if there were no formal contract the arrangement would be found on the minutes of a council meeting held when Bogue was mayor. Following this clue the inspector made an investigation, discovered the minutes of the proceedings in 1902 relating to the rate of fifteen dollars per year, withheld the receipt for $6, and asked for instructions as to how to proceed under the new ordinance already passed. The payment of $6 made May 17 was included in a report made by the inspector to the council on June 17, 1907. This report was the basis of the instruction to the city clerk already mentioned to col-

lect at the rate of $15 per year up to July 1, 1907, and then apply meter rates. The contract relating to the gas main right of way was not found until after this suit had been commenced. The city clerk testified that he notified the plaintiff of the instruction he had received, that before the water was turned off the plaintiff came to his office, discussed the subject of the communication, claimed that he had a contract and receipts, and was asked to produce them so that proper credit could be given but never did so. The plaintiff denied the conversation and denied receiving written notice from the clerk that he was in arrears.

In view of the state of the case as it has been described the court instructed the jury that in order to recover it was necessary for the plaintiff to establish the fact that he had a contract for water at the rate of $6 per year, and gave the following instruction with reference to the right of the city to cut off the supply of water:

"Should you find from the evidence that the plaintiff in this action was not owing anything to the city at the time the water was turned off, or that the last payment made by the plaintiff was for the year 1907, and was full payment for that year, then and in that event, the city had no right to turn off the water from plaintiff's greenhouse and if they did so, would be liable in this action."

The city complains of this instruction on the following grounds: The inspector had no authority except to collect money due; the charges for water for the July-December, 1907, period were not due until July 1; the inspector could not by accepting payment for this period on May 17 waive the city's right to discontinue service on account of delinquencies existing on July 1; and in any event the plaintiff could not by paying in full for the year 1907 secure himself against past delinquencies which were not discharged.

There is no dispute that the plaintiff made the payment of May 17 for water service throughout the en-

tire year. The inspector so understood it. True, he testified that he supposed the payment was for a faucet only, but according to his understanding it was for a faucet for the entire year. The evidence of the city was that an investigation of the plaintiff's standing as a water consumer followed. The payment itself was brought to the attention of the council by the inspector's written report filed with the clerk, and corporate action was taken which was noted on the minutes of the council meeting. The governing body of the city took up the controversy with the plaintiff, and the original power of the inspector is no longer a matter of consequence. The city does not, and of course could not, under the circumstances, disclaim knowledge that the plaintiff was paying for the last half of the year 1907 before the charge for that period was due. It held the money, without protest that it was not receivable in May, and kept it until July 1, when it was in fact payable. Consequently the time when it was received is no longer a matter of consequence. Under these conditions the question arising upon the instruction is this: Assuming that in May the plaintiff paid in full for water for the year 1907, and that his appropriation of the proper sum for that purpose was accepted and retained by the city with knowledge of the facts, was the city obliged to furnish him water for that year regardless of previous defaults?

The general principles of law governing the subject are stated in 1 Farnham on Waters and Water Rights, § 161, p. 854, as follows:

"The company may make reasonable rules for enforcing payment for the water and may be allowed to shut off the supply in case payment is not regularly made. But it will not be allowed to use its power to shut off the water for an ulterior purpose, or to compel payment of disputed bills. The right is given it solely with reference to current matters and to compel payment of bills from period to period as they accrue; and if

Holly v. City of Neodesha.

the transaction is closed, or there is doubt as to the validity of the bill, or the power to shut off the water involves an exercise of a right on the part of the company, which is not clear, equity will interfere to protect the consumer."

Cities which undertake to furnish water to their inhabitants are subject to the same limitations in this respect as private companies operating under city franchises. On the one hand the city can not be driven to innumerable expensive actions at law, involving very small sums of money, and more often than otherwise utterly fruitless to protect its interests. On the other hand, an uninterrupted supply of water is so absolutely indispensable to human existence that an indiscriminate employment of the drastic remedy of cutting it off can not be permitted. The authorities probably go too far in saying broadly that service can not be discontinued because of the nonpayment of disputed bills. The writer inclines to the belief that everyone who receives water through a meter disputes his water bills, particularly those which somehow accrue while his house is closed and he is away on a visit or vacation. Besides this, the city ought not to be compelled to be harsh. Some latitude of time ought to be allowed for the amicable adjustment of claims even against water pirates without imperiling the right of discontinuance. But the right fails unless promptly exercised in an effort to protect against imposition or loss in essentially current affairs.

In this case the city accepted sums of money practically equivalent to a rate of $6 per year at odd intervals for year after year without knowing what the status of the plaintiff as a water consumer was. In 1906, the plaintiff made his position known to the inspector and paid for eighteen months' service at the six-dollar rate. Another year went by, and before the city made any thorough attempt to sound the relations of the parties and reach a definite conclusion as to the plaintiff's true

standing, he paid for water for a year in accordance with his claim. Under these circumstances he was entitled to water for that year, no matter what delinquencies a full accounting for the previous years might disclose.

The plaintiff pleaded the contract upon which he relied, as follows:

"After considerable negotiations between plaintiff and said Charles Van Horn, who was acting on behalf of the City of Neodesha, a special oral agreement was entered into, by the terms of which the city was to run its said gas pipe and line across plaintiff's said premises and was thereafter to furnish plaintiff water for his greenhouse at the rate of six dollars per annum and as long as said gas pipe and line was maintained thereon."

In his testimony the plaintiff stated the conversation with Van Horn as follows:

"In substance he said if I would give him that contract they would furnish water for six dollars a year for my greenhouse and house, is what he said."

Later in his testimony the plaintiff said:

"When I executed the contract, I understood that I was going to have a continuing right to have water for my greenhouse. That is what Van Horn told me."

At that time (1903) the greenhouse was forty feet wide and one hundred feet long. In 1904 it was enlarged by an addition sixteen feet wide and forty feet long. It contained a fifteen-horsepower boiler and from 1500 to 2000 feet of pipe.

In 1906 the plaintiff commenced raising celery. When the water was turned off the celery ground was one hundred and seventy feet long, one hundred and twenty-six feet wide, and contained 13,000 plants. Damages were asked in the sum of $520 for the destruction of these plants. This vegetable garden bore no relation to the plaintiff's greenhouse except proximity, and was clearly not included in his contract for water. Under

the ordinance of December 30, 1903, water rates for gardens and gardening· were to be fixed by special contract. Without a special contract the use of water for such purposes was unauthorized. Under the ordinance of May 23, 1907, gardens and gardeners were to be supplied at meter rates, the consumer to install the meter. The plaintiff had no right under his greenhouse contract to use water for his vegetable garden. It was his duty to install a garden meter. He had ample time in which to do so, both before and after July 1, the date upon which meter rates were to be applied, and his failure to obey the ordinance authorized the city to shut off his supply of water. The instruction given the jury on this subject merely stated that the plaintiff was not entitled to water for garden purposes under the contract made with Van Horn, and that the city could recover for water so used. Hence the instruction was incomplete.

The plaintiff asked for damages in the sum of $7490. The items were: invoice of shrubs, bulbs and plants, $2990, greenhouse rendered valueless, $1500, loss of business, $3000. He gave the following account of his effort to prevent loss after the water was turned off:

"They turned the water off about the 19th of July, 1907. When I first discovered it was turned off, I did n't think anything of it the first day. I supposed they were working on the lines, and the next day I went up to the City Clerk's office to ascertain what the trouble was. I asked him what was the matter with the water out there. He said·he guessed they had turned it off and I asked what for. He said he did not know. I went out to look for the Mayor, could not find him nor none of the council. I went home and went to drawing the water I had, what little I had in the well, and putting it on the plants; then I saw the assistant superintendent of the refinery. I knew they had a pipe line, and asked him what he thought could be done for me to get water up there. He said we might get water of the Standard, but it would take a month. I drew out what water there was in the well and went down into

the well and took a bucket and dipped up what there was there. I did everything to save my plants but they were all destroyed."

On cross-examination he testified as follows:

"Except the conversation I had with Mr. Carroll [the city clerk] the day after the water was turned off, I made no effort to get water from the City of Neodesha. I never asked them to make a rate with me or to furnish water under the ordinance. I did not attempt to ascertain what the ordinances were nor to ascertain what the regulations were for taking water."

The court instructed the jury that it was the plaintiff's duty to improve all reasonable opportunities to avoid and lessen injuries resulting from the city's conduct, and that a failure to use reasonable diligence to that end would bar recovery for loss or damage which might have been so saved. The jury found specially that the plaintiff used his best efforts to obtain water for his greenhouse but failed to do so, and returned a general verdict in his favor for $4550.

The special finding of fact referred to was very material and the defendant's motion to set it aside should have been sustained. The finding was probably induced by lack of knowledge on the part of the jury that the plaintiff could sumbit to the city's exactions without waiving his rights and afterwards recover his outlay, and by lack of knowledge that reasonable diligence required the adoption of such a course rather than suffer his business to be ruined.

The power of the city to withhold the water placed the parties on unequal terms, and the law would have regarded as involuntary any payment made to secure a restoration of service. (*Brown v. Cairns,* 63 Kan. 584, 588, 66 Pac. 639; *Westlake & Button v. The City of St. Louis,* 77 Mo. 47; *Brewing Ass'n v. St. Louis,* 140 Mo. 419, 37 S. W. 525; *Brewing Co. v. St. Louis,* 209 Mo. 600, 108 S. W. 1; *Indiana, etc., Gas Co. v. Anthony,* 26 Ind. App. 307, 58 N. E. 868; *Rowland v. Watson,* 4 Cal.

App. 476; *City of Chicago v. Waukesha Brewing Co.,* 97 Ill. App. 583.)

The only differences between the parties were arrearages to the amount of perhaps $50 and the installation of a meter.  The plaintiff testified that he had a fine trade amounting to $200 per month and increasing every day and made no complaint of financial inability to meet the emergency.  In the face of a gigantic loss immediately impending he might have looked for the water inspector, with whom he had recently transacted water business and from whom a receipt for payment for water service was still due. Under the circumstances it was the legal duty of the plaintiff to secure water from the city at once, and the measure of his damages would have been the amount he would have been obliged to pay in so doing and the amount of damages, if any, provable to the time water could have been again turned on.  (*K. P. Rly. Co. v. Mihlman,* 17 Kan. 224, 234; *Town Co. v. Leonard,* 46 Kan. 354, 358, 26 Pac. 717; *Frick Co. v. Falk,* 50 Kan. 644, 32 Pac. 360.)

The judgment of the district court is reversed and the cause is remanded for a new trial.